IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                        No.6:05cr60019-001

NATHAN AUSTIN                                               DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

The defendant, Nathan Austin, is charged in an indictment filed herein on September 29, 2005, with possession of an unregistered firearm, specifically a "Claymore mine," not registered to him in the National Firearms Registration and Transfer Record, in violation of *26 U.S.C. § 5841, 5861(d)* and *5871.* (Doc. #1)

Pending before the Court are the defendant's motions to suppress statements (Doc. # 16) and second motion to suppress items obtained pursuant to search warrant. (Doc. #17) Hearing on these motions was conducted on November 28, 2005.

At the hearing, the parties agreed that the motion to suppress items obtained pursuant to a search warrant (Doc. #17) is moot. In this regard, the United States stipulated and agreed that the evidence it intends to introduce at trial was obtained prior to the execution of the search warrant and that no evidence that was obtained pursuant to the search warrant, nor any evidence obtained from the items seized pursuant to the search warrant, will be offered into evidence at the trial. The defendant, through counsel, stated that he is satisfied with this stipulation by the United States and accordingly, the motion to suppress items obtained pursuant to the search warrant should be dismissed.

Following the hearing, the undersigned took the motion to suppress statements under

advisement pending the preparation of this report and recommendations.

The defendant asks the court to suppress statements made by him during custodial interrogation conducted by law enforcement officers on the evening of March 14, 2003. (Doc. #16) The defendant contends that, during the questioning, he repeatedly invoked his right to counsel but that questioning continued. He asserts that any statements made by him after he invoked his right to counsel should be suppressed. In response, the United States argues that Austin waived his right to counsel and, in fact, never requested counsel during the interview. (Doc. #19)

**Evidence presented:**

The following evidence was presented during the suppression hearing.

**Tony McCutcheon:** Tony McCutcheon is a special agent for the United States Bureau of Alcohol, Tobacco and Firearms ("ATF"), stationed in Fort Smith, Arkansas. He was involved in the investigation of Austin.

On March 14, 2003, after his arrest on a state arrest warrant at his home at approximately 5:00 p.m., Austin was taken into custody and brought by law enforcement officers to a break room in the Montgomery County Courthouse for questioning. Present during questioning at the courthouse were: Austin; McCutcheon; 18th West Drug Task Force Officer Chris Martin; Deputy Mike May of the Montgomery County Sheriff's Department; Arkansas State Police Officer Scott Bradshaw; and, Alton Cambere of the ATF.

The individuals were seated around a rectangular table with Austin at one end and officers on the other side. Austin was handed an ATF form number 3200.4, "Waiver of rights." McCutcheon read from one copy of the form and Austin followed along on another. As each
-2-
AO72A
(Rev. 8/82)

right was read, Austin was asked if he understood. If he did understand, he was asked to initial the right on the form. He was then asked to sign the form at the bottom, indicating that he understood all of his rights. Austin signed the form, dated it and wrote the time down; McCutcheon signed the form and Agent Cambere and Officer Bradshaw signed the form as witnesses. This form was received into evidence as **U.S. exhibit #1.**

Austin appeared to have no physical or mental disability. Austin could understand and did not appear to be under the influence of alcohol or drugs. He was able to converse. No threats were made to Austin, nor were any promises made to him. Austin was told that all of the information which he gave would be taken to the prosecutor. No promise was made as to whether or not he would be charged or as to the sentence. He was not offered immunity.

Austin was questioned for approximately one and one-half hours. No breaks were taken. The atmosphere was relaxed and no tension was present. The break room was well lit. No offer was made to allow Austin to smoke. McCutcheon can not remember if Austin was offered a drink. There was a Coke machine in the break room. Austin was allowed to go to the restroom if he needed to do so. No tricks were played and it was a very quick interview. The interview was not recorded. Austin never asked to stop the interview. Austin has been arrested before and was familiar with police procedures.

Austin quickly stated that law enforcement had all of the explosives and that they were his. He stated that he had hidden the items on a hillside. He stated that after he was questioned by Investigators Chris Martin and Mike May in February 2003, he retrieved the items from the hillside and placed them in a water hole one and one-half miles from his house where the items were found. He admitted that he obtained the items six years earlier, from a person in

Texarkana.

McCutcheon took notes and placed his notes in his report. No statement was signed by Austin.

There was no effort to coerce Austin. Austin never asked for a lawyer. If he had done so, the questioning would have stopped. He never asked to stop the interview at any time.

Austin was arrested at his home. When officers entered, Austin was showering and still had soap in his hair. He was allowed to rinse, dry off and put his clothes on. McCutcheon was in the living room. When Austin came into the living room he had clothes on.

After questioning, Austin was turned over to Officer Martin or Deputy May. McCutcheon does not know whether Austin was questioned further after the session ended.

The warrant for Austin's arrest was signed at 3:55 p.m. and Austin was arrested between 4:45 to 5:00 p.m. McCutcheon believes that Austin was transported to the courthouse at the same time as McCutcheon traveled there. The questioning began at approximately 6:25 p.m.

McCutcheon does not know if Montgomery County officers questioned Austin before this interrogation. The only question asked at Austin's house was whether he had any weapons in his house. This was asked for officer safety. Officers had information that Austin had explosives.

When McCutcheon left the jail later, Austin was outside waiting for a ride. This could have been as late as 10:00 p.m. but McCutcheon believes it to be earlier.

Austin did not ask for a lawyer at any time while McCutcheon was around him. No one said that Austin did not need a lawyer. Austin did not ask for an attorney when the rights form was read to him. McCutcheon was the main speaker although Martin and May perhaps made

AO72A
(Rev. 8/82)

brief comments.

McCutcheon is sure that Austin was told that he was looking at probable jail time.

**Chris Martin:** In March, 2003, Chris Martin was the chief investigator for the 18th West Drug Task Force. He was present when the search warrant and arrest warrant were executed at Austin's home at 4:45 p.m. on March 14, 2003.

Austin lived in a mobile home. Officers knocked, announced and entered. Austin was naked in the master bedroom shower. Austin was told that officers were there under a search warrant. Austin was told that he could finish his shower and he was allowed to dress.

Martin took Austin to the living room and Austin was told why officers were there. Austin was not advised of his rights and no effort was made to interview him. Martin questioned Austin at the house about weapons. Martin had reason to think that Austin was dangerous. Martin asked Austin where two inert hand grenades were. Austin made no request for a lawyer nor did he indicate that he wanted one. Connie, Austin's significant other, remained on the couch in the living room.

The house and out building were searched. Officers spent approximately one and one-half hours at the house. Austin was handcuffed and transported by a deputy sheriff to the courthouse. It took 30 to 45 minutes to travel from the house to the Sheriff's office.

The questioning began immediately upon Austin's arrival at the courthouse. Martin was present during the questioning, although he did not ask questions. McCutcheon asked all of the questions. Present were: Martin, McCutcheon, May and another officer. Austin was at the head of the table and the officers were on the sides of the table. Martin heard McCutcheon advise Austin of his rights. Austin initialed and signed the rights form. Martin witnessed this. Austin

never requested an attorney. Martin did not hear anyone tell Austin that he did not need an attorney. If Austin had asked for an attorney the questioning would have stopped and he would have been taken to jail and allowed a lawyer. Austin was never threatened and he was not handcuffed during the interview session. No one told Austin that if he didn't talk he might see jail time.

The interrogation turned into Austin asking, "What can I do to help you." There was not a whole lot of questioning going on. "It turned more into Nathaniel wanting to get his butt out of trouble, and what he could do for Tony and the ATF in Texarkana."

Martin thinks that Austin was given coffee. No promises were made to Austin. Austin was allowed to go to the rest room if needed. The interview lasted one and one-half to two hours at the most. Austin was then taken by a deputy to be booked. After the interview, Martin had no more contact with Austin that night.

**Mike May:** Mike May is a senior investigator with the 18th West Drug Task Force in Mount Ida, Arkansas. He was present at Austin's arrest on March 14, 2003. He secured the perimeter of the house, then went in and participated in the search. He helped search the bedroom of the house. The search lasted one to one and one-half hours.

May did not speak to Austin at the residence. He did not hear Austin ask for a lawyer at the residence or make any other statement. At approximately 6:00 p.m. Austin was taken to Mount Ida by a deputy.

May was present at and participated in the interview at the courthouse. Austin was advised of his rights and May signed the rights form as a witness. Austin appeared to understand his rights and responded appropriately. Austin did not appear to be impaired. Austin never

AO72A
(Rev. 8/82)

asked for a lawyer. May never made threats or promises to Austin, nor did May comment upon the charges. May was in the interview room the entire time and never heard Austin ask for an attorney. Austin was very cooperative. May did not hear anyone tell Austin that if he did not talk he would go away for a long time. May did not say that he didn't: "come down there to whistle Dixie."

The interview lasted two hours maybe less and ended by 8:30 p.m.; then a jailer booked Austin. May has no knowledge as to when Austin was released.

May had previously interviewed Austin about explosives.

**Alton Cambere:** Alton Cambere is a special agent with ATF. On March 14, 2003, he was with the Little Rock Field Office. He accompanied Agent McCutcheon in the arrest and interview of Austin. Cambere did not question Austin at his home and he is not aware of anyone else questioning Austin there. Cambere did not handle Austin at the arrest. He was present during the interview at the courthouse in Mount Ida, Arkansas. He was present when Austin was advised of his rights and when the rights form (U.S. Ex. #1), was filled out. McCutcheon read the form and Cambere heard Austin's responses. Cambere signed the rights form as a witness.

Austin did not appear to be under the influence of any substance. Austin responded appropriately. Austin signed the rights form. No threats or promises were made. There was no coercion of Austin.

The questioning lasted approximately one hour and ended at approximately 8:00-8:30 p.m.

Austin did not ask for a lawyer at the home or elsewhere. Had Austin requested a lawyer the questioning would have stopped. Cambere never told Austin that he might be facing jail time

-7-

AO72A
(Rev. 8/82)

if he didn't speak or do something, and he did not say: "We didn't come down here to whistle Dixie and you'd better start talking." He never told Austin that he did not need a lawyer.

Cambere had no contact with Austin before March 14, 2003, and has had no contact with him since the questioning.

**Nathaniel Austin:** Nathaniel Paul Austin testified that his home is in Caddo Gap, Arkansas, 13 miles and a 15 minute drive from the Montgomery County Courthouse.

Austin was arrested at his home, on state charges, on March 14, 2003. At the time he was in the shower. The shower door was jerked open and Officer Chris Martin removed him from the shower and arrested him, with soap still in Austin's hair. Austin was handcuffed and his wife helped him put on his work pants. There was no questioning at the home other than, perhaps, a question as to whether Austin had any weapons in the house. He was not advised of his rights at the house. He was taken to the Montgomery County Courthouse.

At the Montgomery County Courthouse, Austin was questioned before the *Miranda* rights were read, although he does not remember what the questions were.

Austin was shown the rights form (U.S. Ex. #1). The initials and signature on the exhibit are his. He understood his rights and he understood that he had the right to stop questioning and talk to a lawyer at any time. Austin was then 35 years old. He has a high school education. His work history is as a logging contractor for 13 years. He described himself as intelligent and able to communicate.

Austin testified that he became frightened during questioning and said "I think I need a lawyer present before I answer any more questions for fear I may incriminate myself." One of the ATF agents leaned over the table and looked Austin in the eye and told him: "You don't need

-8-

a lawyer right now, what you need to do is tell us where this stuff come (sic) from and help us out on this investigation or we're fixing to put you away for a long time and you'll have plenty of time to think about it then." Austin broke down and began to cry. He didn't know what to do. Austin made his request for a lawyer clear. The other ATF agent said: "We didn't come all the way down here to whistle Dixie. I've got a live Claymore Mine in the trunk of my car and you're going to talk or we're fixing to put you away for a long time." Austin made three different requests for an attorney. The questioning continued.

McCutcheon did 75 to 80% of the questioning. Agent Cambere asked some questions. All of the officers heard Austin's request for an attorney. All were seated around a table. There were no threats of violence.

Austin stated that he had never been interviewed like this before.

Austen was released on an O.R.

**United States Exhibit #1**: U.S. Exhibit #1 is a copy of a ATF Form 3200.4 (5-94) "Waiver of Right to Remain Silent and Right to Advice of Counsel". The form is dated March 14, 2003. The initials "NA" are written beside each right's statement. The form contains provisions stating that the signatory has read the statement of rights, that it has been read to him, that he understands those rights, that the stated rights are voluntarily and intentionally waived and that the signatory is willing to make a statement and answer questions. The form is signed in two places by Nathaniel Austin, witnessed by Alton Cambere and Scott Bradshaw.

**Discussion:**

"[T]he Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning." *Illinois*

AO72A
(Rev. 8/82)

v. Perkins, 496 U.S. 292, 296 (1990) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Miranda provides that the accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has a right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda v. Arizona, 384 U.S. at 478-79.

Austin does not contend that the Miranda warnings were not given to him. He admits that he read and understood the information conveyed in the ATF Form 3200.4 "waiver of rights" which he reviewed, initialed and signed. The ATF form (U.S. Ex. #1) conveys the Miranda rights. See United States v. Bowles, 2005 WL 2271920 n. 3 (D. Me. 2005)(ATF Form 3200.4 conveys the Miranda rights). He admits that the form further contains his signed statement that he voluntarily and intelligently waived his rights and was willing to make a statement and answer questions. (U.S. Ex. #1)

Austin asserts, however, that the statements made by him during the March 14, 2003, interview in the Montgomery County Courthouse conference room should be suppressed on the ground that any such statements were made after his requests that questioning end and that he have the assistance of counsel were disregarded by the questioning officers and because the officers used threats and other coercive tactics against him.

In response, the United States argues that Austin was advised of his Miranda rights and after acknowledging his understanding of those rights proceeded to voluntarily make statements to the questioning officers without ever invoking his right to terminate the questioning or confer with counsel.

AO72A
(Rev. 8/82)

"A defendant who is in custody and has invoked his right to counsel pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.CT. 1602, 16 L.Ed.2d 694 (1966), may not be interrogated further by authorities, unless the defendant 'initiates further communication, exchanges, or conversations with the police.'" *United States v. Jones*, 2001 WL 704428 (8th Cir. 2001)(quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)); *see also United States v. Barahona*, 990 F.2d 412, 418 (8th Cir. 1993)("Once a suspect invokes his right to have counsel present during a custodial interrogation, all questioning must cease until counsel is present").

> ... This right is derived from the Fifth Amendment's privilege against self-incrimination, and may of course be waived. *See id* at 474-75, 86 S.Ct. at 1628. The government bears the burden of proving by a preponderance of the evidence that the defendant knowingly and voluntarily waived this right. *Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986); *United States v. Dougherty,* 810 F.2d 763, 773 (8th Cir.1987). The voluntariness of a waiver depends on the absence of police overreaching, that is, the relinquishment of the right must have been the result of a free and deliberate choice rather than intimidation, coercion, or deception. *Connelly,* 479 U.S. at 170, 107 S.Ct. at 523; *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140-41, 89 L.Ed.2d 410 (1986); *Fare v. Michael C.,* 442 U.S. 707, 726-27, 99 S.Ct. 2560, 2572-73, 61 L.Ed.2d 197, *reh'g denied,* 444 U.S. 887, 100 S.Ct. 186, 62 L.Ed.2d 121 (1979). In determining whether a valid waiver has been made, a trial court must look at the totality of the circumstances in each case, including the background, experience, and conduct of the accused. *Dougherty,* 810 F.2d at 773; *Stumes v. Solem,* 752 F.2d 317, 320 (8th Cir.), *cert. denied,* 471 U.S. 1067, 105 S.Ct. 2145, 85 L.Ed.2d 502 (1985); Fare, 442 U.S. at 72425, 99 S.Ct. at 2571-72.

*United States v. Barahona*, 990 F.2d 412, 418 (8th Cir. 1993)

The issue presented turns on the credibility of the witnesses. In a written submission to this court, Austin admits that "[p]rior to questioning ...[he]... signed a written rights form and waiver." (Brief in Support of Motion to Suppress Defendant's Post Arrest Statement, Doc. #28). At the hearing on the subject motion, Austin admitted that he initialed and signed the rights form, that he understood his rights and that he understood that he had the right to stop the questioning

-11-

and talk to a lawyer at any time. He described himself as intelligent and able to communicate.

Austin further testified that shortly after the questioning began, he decided that he needed an attorney and he stated to the officers that he wanted to have an attorney present before he answered any more questions. He testified that he made this request three times but that the questioning continued.

On the other hand, all of the officers present during the questioning agree that Austin never asked that the questioning stop and never requested an attorney. There is no evidence that the physical environment was coercive or that Austin was threatened with violence. It is uncontroverted that the interview was conducted in the courthouse "break room", rather than the county jail or Sheriff's office. Officers described the atmosphere as relaxed. The officers testified, without contradiction, that the interview was only one to two hours in length.

Austin testified that officers leaned over him, told him that he did not need an attorney and that if he did not talk they would send him away for a long time. The officers deny that such actions were taken or that such statements were made. In fact, Investigator Martin testified that Austin was anxious to answer questions and to assist the officers in their investigation.

From listening to and observing the witnesses during the hearing and after consideration of all of the evidence presented, we credit the testimony of the officers. It is found that Austin heard, understood and waived his *Miranda* rights. Further, Austin knew that he had the right to stop the questioning and invoke his right to counsel at any time. He did not do so.

Thus, from a thorough review of the totality of the circumstances, it is found that the United States has carried its burden of proving that Austin knowingly and voluntarily waived the Fifth Amendment's privilege against self-incrimination and never invoked his right to counsel.

*Miranda v. Arizona*, 384 U.S. at 474-75 (Fifth Amendment privilege against self-incrimination may be waived); *see also United States v. Rohrbach*, 813 F.2d 142, 145 (8th Cir. 1987)(in considering motion to suppress, the District Court is permitted to evaluate the relative credibility and persuasiveness of the witnesses).

Accordingly, from the foregoing, we find that the motion to suppress statements (Doc. #16), should be denied.

**Conclusion:**

In conclusion, it is recommended that the motion to suppress items seized pursuant to the execution of the search warrant (Doc. #17), be dismissed as moot based upon the stipulation of the United States. Further, for the reasons set forth above, it is recommended that the motion to dismiss statements (Doc. #16) be denied.

**The parties have ten (10) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger *de novo* review by the district court.**

DATED this 27th day of December 2005.

> */s/ Bobby E. Shepherd*
> HON. BOBBY E. SHEPHERD
> UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)